AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| ALVIN SANDERSON | ) | |
| | ) | |
| *Defendant(s)* | ) | |

FILED
11 MAR 18 PM 3:45
MICHAEL R. MERZ
UNITED STATES
MAGISTRATE JUDGE

3:11mj082
MICHAEL R. MERZ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 5, 2011 - present___ in the county of ___Fayette/Montgomery___ in the ___Southern___ District of ___Ohio and elsewhere___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. s. 846 and 841(b)(1) (A) | Conspiracy to Distribute in excess of 5 kilograms of cocaine |

This criminal complaint is based on these facts:

See Attached Affidavit of J. Matthew Allen

☑ Continued on the attached sheet.

_____
Complainant's signature

J. Matthew Allen, SA of the DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___03/18/2011___

_____
Judge's signature

City and state: ___Dayton, Ohio___     Michael R. Merz, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT

I, J. Matthew Allen, being duly sworn, state as follows:

I.

INTRODUCTION

1.   I am a Special Agent of the United States Drug Enforcement Administration ("DEA") currently assigned to the Dayton Resident Office.  I have been employed with the DEA as a Special Agent since September 12, 2010.  I have attended and graduated from the basic agent training course in Quantico, Virginia.  During my tenure with the DEA, I have received extensive training in the investigation of violations of federal drug laws.  Before joining the DEA, I served as a Kentucky State Trooper from July 17, 2005 to September 11, 2010.  As a trooper, I participated in numerous investigations, including matters involving drug interdiction.

II.

PURPOSE OF AFFIDAVIT

2.   I make this affidavit in support of:

a.   an application for a search warrant of the following premises as there is probable to believe that evidence, contraband, fruits of a crime, other items illegally possessed as well as property designed for use, intended for use, or used in committing violations of: 21 U.S.C. § 841(a)(1) (distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to distribute

1

controlled substances); and 21 U.S.C. § 843(b) (use of a telephone communication facility), exists and can be found at the following locations:

    (1) The premises located at 1792 Vancouver Drive, Dayton, Ohio, including any garages, vehicles, storage lockers, cabinets, sheds, closets or out buildings at this location. 1792 Vancouver Drive, Dayton, Ohio is more fully described in Attachment A, and Attachment A is incorporated herein by reference;

    (2) The premises located at 4180 US Highway 62 NE, Washington Courthouse, Ohio, including any garages, vehicles, storage lockers, cabinets, sheds, closets or out buildings at this location. 4180 US Highway 62 NE, Washington Courthouse, Ohio is more fully described in Attachment B and Attachment B is incorporated herein by reference.

    b. an application for criminal complaints against MICHAEL EVANS and ALVIN SANDERSON as there is probable cause to believe that they have committed violations of 21 U.S.C. §§ 846 and 841(b)(1)(A).

    3. This affidavit is intended to show that there is sufficient probable cause for the above-described search warrants and criminal complaints and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based, in part,

on personal knowledge derived from my participation in this investigation and, in part, on information and belief, including: oral and written reports regarding this and other investigations that I have received, directly or indirectly, from local law enforcement officers; physical surveillance conducted by other agents and local law enforcement that has been reported to me directly or indirectly; and information obtained from a cooperating witness also known as a confidential source[1] ("CS") that has been reported to me, directly or indirectly, by other law enforcement personnel.

## III.

### ITEMS TO BE SEIZED

4. A list of the specific items to be seized from the premises described in Paragraphs 2(a)(1) through 2(a)(2) is attached hereto as Attachment C, and Attachment C is incorporated herein by reference.

5. Based on my training and experience, as detailed above, I believe that there is probable cause to believe that the items listed in Attachment C will be found at the premises described in Paragraphs 2(a)(1) through (a)(2).

---

[1] Based on my conversation with other law enforcement officers, this CS previously has provided accurate and reliable information to authorities. As detailed more fully below, law enforcement has corroborated information received from the CS through its review of audio and video recordings obtained during the investigation of this matter.

IV.

**SUMMARY OF PROBABLE CAUSE**

6. On March 8, 2011, Detective Larry McGarvey of the Fayette County Sheriff's Department advised me that the US 23 Major Crimes Task Force ("Task Force") -- a law enforcement group located in Washington Courthouse, Ohio -- had received information from a CS concerning the possible delivery of 17 kilograms of cocaine from Los Angeles, California to Dayton, Ohio. Based on ensuing discussions with Detective McGarvey as well as the CS, I learned the following information:

    a. During January 2011, the CS began to work as an informant for the Task Force. Shortly thereafter, the CS advised the Task Force that the CS's former employer, Alvin Sanderson of Sanderson's Painting, was likely involved in the sale and distribution of crack cocaine. Based on this information, the Task Force instructed the CS to reintroduce himself to Sanderson.

    b. On or about February 1, 2011, the CS obtained a job as a painter with Sanderson. Approximately two days later, Sanderson approached the CS and asked if the CS could move any crack cocaine or heroin for him, i.e., Sanderson. Sanderson quoted the CS a price of $100 a gram for cocaine and $120 a gram for heroin.

    c. Based on this information, during February 2011, the Task Force arranged two separate controlled buys of crack

4

cocaine from Sanderson's residence located at 4180 US Highway 62 NE, Washington Courthouse, Ohio. On each occasion, the Task Force provided the CS with buy money. The CS then proceeded to Sanderson's residence. During the first deal, Sanderson advised the CS that he, Sanderson was out of crack and arranged for the CS to purchase crack cocaine from another person who was living at 4180 US Highway 62 NE, Washington Courthouse, Ohio. During the second deal, the CS purchased crack cocaine - approximately 1/8 of an ounce - at the residence directly from Sanderson.

      d. On or about March 5, 2011, Sanderson telephonically contacted the CS and inquired if the CS wanted to earn some money. Sanderson directed the CS to come to Sanderson's residence -- 4180 US Highway 62 NE, Washington Courthouse, Ohio. Acting under the direction of the Task Force, the CS proceeded to Sanderson's residence. Upon arriving there, the CS observed not only Sanderson but also another individual known to the CS as Michael Evans. Sanderson and Evans proceeded to ask if the CS wanted to drive a semi-truck to Los Angeles, California, to pick up an unspecified quantity of cocaine[2] and then drive the semi-truck back to Dayton, Ohio. (It should be noted that the CS is a licensed truck driver).

      (1) When the CS expressed interest in their

---

[2] For the information of the Court, cocaine is a Schedule II controlled substance.

offer, Sanderson and Evans began to ask the CS questions concerning how they could make the trip appear legitimate. The CS explained that the CS would need a bill of lading that detailed what the CS was en route to pick up in California. Sanderson and Evans asked the CS if the CS would be willing to prepare the bill of lading.

(2) Sanderson and Evans offered the CS: $2000.00 for expenditures on the trip to California; $2000.00 for expenditures on the trip back to Ohio; and $6800.00 for successfully delivering the cocaine. Evans also offered to pay for pre-paid, throw away phones that the CS would use to keep in contact with Evans during the trip. During the meeting, the CS overheard a conversation in which the CS believed that Evans and Sanderson were discussing 70 kilograms of cocaine.

(3) During this meeting, Evens prepared on Sanderson's personal computer at the residence a sham contract to make the CS's planned trip appear legitimate. The contract was between "B J Transportation / Sanderson Painting."

e. Sometime after the meeting concluded, the Task Force instructed the CS to call Sanderson. During the telephone call, the CS expressed concern to Sanderson about driving 70 kilograms of cocaine across the United States. Sanderson responded that the CS should not worry about anything and that it

//

6

would be a fun trip; Sanderson also corrected the CS, indicating that the load would consist of 17, not 70, kilograms of cocaine.

   f. On March 7, 2011, while under surveillance by the Task Force, the CS went to Sanderson's house. Once there, Sanderson directed the CS to call Sherwin Williams and ask for blank bills of lading from an individual named Josh. Pursuant to Sanderson's instructions, the CS advised Josh that Sanderson would "take care of him later" for providing the blank bills of lading. Given that the CS knows that Josh obtains crack cocaine from Sanderson, the CS believed that Sanderson intended to give Josh drugs for supplying him with the bills of lading. After completing this call, Sanderson drove the CS to a Sherwin Williams store located in Washington Courthouse, Ohio. At Sanderson's direction, the CS entered the Sherwin Williams, obtained the blank bills of lading from Josh, and then returned to Sanderson's vehicle.

   (1) While still under surveillance of the Task Force, Sanderson and the CS proceeded to Jeffersonville, Ohio, where they picked up an individual identified herein as M.F. According to the CS, Sanderson drove M.F. to several locations in the Jeffersonville area, where M.F. delivered small quantities of crack cocaine.

   (2) After completing these deliveries and dropping M.F. off, Sanderson and the CS drove to Evans's home in

Dayton, Ohio – namely, 1792 Vancouver Drive, Dayton, Ohio. Once there, Sanderson and the CS entered the residence, where they met Evans. While in the residence, the CS observed what he believed to be distribution size quantities of crack cocaine, Vicodin and heroin. The CS, in fact, observed Evans distribute small quantities of cocaine to several people who were performing work on Evans's residence.

(3) Evans, Sanderson, and the CS then discussed the planned trip to California. Sanderson signed the sham contract that Evans had prepared during the March 5, 2011 meeting. Evans collected the contract – of which there were three copies – and the bills of lading, and these documents in three separate folders, which he then stored in his bedroom closet. Evans intended to give one of these folders to the CS upon the CS's departure for California. Evans, Sanderson and the CS again discussed the pick up and delivery of the 17 kilograms of cocaine. For instance, the three discussed the locations at which they could link up in California. (Evans had advised the CS that Evans intended to meet the CS in California to personally arrange the delivery of the cocaine to the CS's truck). The three also agreed that Evans would fly to California on March 9, 2011 and would met up with the CS in California no later than March 11, 2011.

//

8

7. After learning the above-described information, the DEA instructed the CS to come to the DEA Dayton Resident Office on March 8, 2011. Once there, the DEA had the CS contact Evans and advise Evans that the CS's semi-trailer had broken down in Wisconsin and that their planned trip to California would have to be delayed. Evans demanded proof that the semi-trailer was broken down. Shortly thereafter, Sanderson called the CS. During this call, Sanderson expressed frustration that the CS had placed Sanderson in a bad situation with the truck breaking down. Sanderson also provided the CS with Evans's e-mail address and instructed the CS to e-mail proof of the truck's breakdown to Evans.

8. On or about March 10, 2011, the CS, Evans and Sanderson met at Sanderson's residence – 4180 US Highway 62 NE, Washington Courthouse, Ohio. During this meeting, the CS provided Evans and Sanderson with a DEA-supplied receipt that purported to document that the CS's truck had broken down in Wisconsin. Apparently satisfied with the receipt, Evans and Sanderson instructed the CS to notify them when the CS was ready to make the trip.

9. On or about March 15, 2011, at the direction of DEA and consistent with Evans's and Sanderson's request, the CS called Evans and indicated that the CS was ready to leave for California to pick up the cocaine on March 17, 2011.

//

10. On or about March 16, 2011, the CS again called Evans and requested that they meet one another in person at Evans's residence. Evans agreed to this meeting.

11. On or about March 17, 2011, the CS went to Evans's residence, where he met with Evans and Sanderson. Once there, Evans took the CS to Evans's bedroom. Evans proceeded to give the CS one of the three folders containing one of the contracts and bills of lading. Evans advised the CS that he, Evans, would be flying to California on March 18, 2011 and would meet the CS at a predetermined meet location in California. The CS understood that, at this meet location, Evans would give the CS the cocaine to transport back to Ohio.

12. Based on my training and experience as well as discussions with experienced DEA special agents and other law enforcement officers, I know the following information:

   a. It is common practice drug traffickers and drug distributors hide their assets, their addresses, their telephone and beeper/pager services by using other person's names in order to avoid discovery by law enforcement officials;

   b. It is common practice that drug traffickers and drug distributors often maintain residences which are used as stash houses or locations for drug storage and distribution and use nominees to obtain telephone service, utility service, et cetera, once again to hide the true identity of the owner or

person who will use that service;

    c.   It is common practice that drug traffickers and drug distributors often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials;

    d.   It is common practice that even though these assets are in nominee names, drug traffickers and drug distributors continue to utilize these assets by exercising dominion and control over them;

    e.   It is common practice that drug traffickers and drug distributors maintain on hand large amounts of U.S. Currency in order to finance their ongoing drug business;

    f.   It is common practice that drug traffickers and drug distributors maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs; drug traffickers and drug distributors commonly front (provide drugs on consignment) to their clients; that the aforementioned books, records, receipts, notes, ledgers, et cetera, are maintained where the drug traffickers and drug distributors have ready access to them;

    g.   It is common for drug traffickers and drug distributors to provide false information to law enforcement

//

11

officials regarding their identity and the actual address of their residence;

      h.   It is common for drug traffickers and drug distributors to conceal drugs, contraband, proceeds of drug sales, at locations within their residences and/or their businesses and within vehicles located at their residences and/or businesses from law enforcement officials;

      i.   Persons involved in drug trafficking and drug distribution conceal in their residences and businesses, drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the obtainment and concealment of large sums of money acquired from engaging in drug trafficking and drug distribution activities;

      j.   That when drug traffickers and drug distributors amass large proceeds from the sale of drugs, the drug traffickers and drug distributors attempt to legitimize (launder) these profits; that to accomplish these goals, drug traffickers and drug distributors many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, letters of credit, et cetera; that other entities used to launder moneys include real estate firms and purported legitimate business fronts;

k. It is common practice that drug traffickers and drug distributors commonly travel to purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, the traffickers and drug distributors would transport, or cause to be transported, drugs to areas in which they will distribute the drugs; and that the methods of transportation include, but are not limited to, commercial airlines and rental and private automobiles;

l. It is common practice that drug traffickers and drug distributors commonly maintain addresses or telephone numbers in books and documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking and drug distribution organization;

m. That drug traffickers and drug distributors take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of traffickers and drug distributors;

n. That drug traffickers and drug distributors have in their possession, (that is on their persons, at their residences, and/or their businesses), firearms, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, knives, and other weapons; that said firearms are used to protect and secure a drug trafficker's and drug

13

distributor's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, U.S. Currency, et cetera;

    o. That drug traffickers and drug distributors frequently maintain hidden compartments within their residences and vehicles, as well as bury drugs, money, and other items of evidence in containers such as shoe boxes, in safes, or hidden compartments inside the residences;

    p. That drug traffickers and drug distributors frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

Based on the foregoing, I submit that there is probable cause to issue search warrants for the above-described premises and to issue criminal complaints against Alvin Sanderson and Michael Evans.

DATED: March 18, 2011

_____
J. Matthew Allen
Special Agent
Drug Enforcement Administration


Subscribed To And Sworn Before
Me This 18th Day of March, 2011.

_____
The Honorable Michael R. Merz
United States Magistrate Judge
Southern District of Ohio